IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 4, 2007 Session

# DAVID MICHAEL RUST V. SOUTHERN ENVIRONMENTAL CONTRACTORS, INC., ET AL.

Appeal from the Chancery Court for Davidson County
No. 02-592-II    Carol L. McCoy, Chancellor

———————————————————

No. M2006-00704-COA-R3-CV - Filed February 26, 2008

———————————————————

An employee/minority shareholder appeals the summary dismissal of his action in which he sought to recover commissions the corporation allegedly owed him for prior work and damages arising out of an alleged breach of fiduciary duty and fraud by the president/majority shareholder. The trial court granted the Motions for Summary Judgment filed by the corporation and by the president/majority shareholder, finding the employee failed to show that there was a genuine issue for trial as to whether employee was owed commissions and whether the president/majority shareholder committed fraud or breached his fiduciary duty. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed**

ROBERT HOLLOWAY, SP.J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and ROBERT W. WEDEMEYER, J., joined.

David Young Parker, and David Zager, Nashville, Tennessee, for the appellant.

H. Buckley Cole, and Darlene T. Marsh, Nashville, Tennessee, for the appellees, Southern Environmental Contractors, Inc. and Byron Taylor, individually.

**OPINION**

Byron Taylor (Taylor) has been in the waste disposal and environmental consulting business since 1975. In 1994, Taylor organized Southern Environmental Contractors, Inc. (SEC). Taylor owned 51% of the common stock and served as president, David Michael Rust (Rust) owned 39% of the stock, and Malcolm Pfotenhauer owned the remaining 10% of the stock and served as secretary/treasurer.

Rust was in charge of the day-to-day operations of SEC. The corporation acted as a general contractor providing environmental remediation for various customers through subcontractors who actually performed the bulk of the work. SEC's business involved storage tank closure or remediation, asbestos removal, demolition, and lead based paint abatement. Neither Taylor nor Pfotenhauer was involved in the day-to-day operation of SEC during the time Rust was employed by the corporation.

On August 21, 2001, Rust was involved in an automobile accident which ultimately resulted in his incarceration for vehicular homicide and driving under the influence. Rust's relationship with Taylor began to deteriorate following the accident. Taylor claimed shortly after Rust was arrested, Rust's wife called him demanding payment of $150,000.00 and threatening him if she did not get the money. Taylor notified the Belle Meade Police, and they provided surveillance for a time to his residence. After the accident, Rust rarely came to the office. SEC terminated Rust's employment when he began serving a five (5) year sentence.

Taylor claimed that at that time he first became aware of alleged improper business practices of Rust.

Because of Rust's incarceration, the problems with Rust's wife, and what he learned about Rust's business practices, Taylor decided to begin the dissolution of SEC. On December 21, 2001, a Notice of a Special Meeting of the Shareholders was sent by certified mail to Rust. The stated purpose of the meeting was to consider and vote on a proposal to sell all, or substantially all, of the property of the corporation and to distribute the net proceeds to the shareholders within one (1) year. Taylor and Pfotenhauer, representing sixty-one percent (61%) of the voting stock, attended the January 4, 2002 meeting and voted to approve the Plan of Dissolution. The accounts receivable were collected, and the physical assets of the corporation were sold at public auction. The net proceeds from the liquidation of the assets of SEC were insufficient to pay all of the SEC debts. Taylor, who had personally guaranteed SEC's line of credit with SunTrust Bank, paid $36,500.00 to pay off that line of credit.

Shortly after Rust was fired, Taylor formed a separate enterprise, Southern Environmental Contracting, LLC, (the LLC). This business offered similar services as SEC and had a similar logo, the same telephone number, and the same address as the corporation. Most of the physical assets of SEC sold at auction were bought by the LLC, although Rust attended the auction and purchased some assets. In preparation for the auction, Taylor arranged a line of credit through SunTrust Bank for the LLC. Taylor drew $73,417.80 on the LLC line of credit. That draw was deposited by electronic transfer into the account of SEC. Taylor claimed the deposit into the account of SEC was an error by SunTrust. When he found out about the deposit, he had the money transferred to the LLC account. Taylor said SEC did not repay any of the LLC debt.

## I. Standard of Review

The standard for review of a summary judgment determination is *de novo*. There is no presumption of correctness attached to the trial court's opinion. The moving party has the burden

to show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04 When the Motion for Summary Judgment is properly supported, the non-moving party "may not rest upon the mere allegations or denials"of his pleading. The burden shifts, and the non-moving party must respond "by affidavits or as otherwise provided" so as to show there "is a genuine issue for trial." Tenn. R. Civ. P. 56.06; *Knapp v. Holiday Inns, Inc.*, 682 S. W. 2d 936 (Tenn. App. 1984).

Both SEC and Taylor filed Motions for Summary Judgment. The corporation's motion deals with the claim for commissions; Taylor's motion deals with breach of fiduciary duty and fraud. Both motions were supported by portions of Rust's depositions, portions of the deposition of Rust's expert, Richard A. Fridge, the affidavit of Jennifer Aker, the affidavit of Tony Hrinda, and the affidavit of Taylor. A thorough review of these supporting documents must be made to determine if the burden shift**s** to Rust under Tenn. R. Civ. P. 56.06.

## II. Analysis

### A) SEC's Motion for Summary Judgment -- Claim for Commissions

First, Rust claims the trial court erred when it granted SEC summary judgment on the issue of whether Rust was entitled to additional commissions.

In the Amended Complaint filed April 3, 2002, Rust itemized fifteen (15) projects on which he had been project manager and for which he estimated he was owed commissions totaling $256,000.00. The following excerpts are taken from the supporting documents to SEC's Motion for Summary Judgment:

**Jennifer Aker Affidavit.** Jennifer Aker provided bookkeeping services for SEC from approximately August, 1999 to January, 2002. She reported directly to Rust. She stated SEC maintained a file on each project, and that each file designated the project manager. If the project was profitable, the project manager would receive a commission. If the project was not profitable, the project manager would lose money. Aker stated that Rust instructed her on several occasions to shift expenses between projects to make it appear a project made a profit. She also said that Rust instructed her to submit certified payroll information to the Commonwealth of Kentucky that was false, Rust improperly billed personal expenses to project files, and Rust would use SEC employees for personal business.

**Tony Hrinda Affidavit.** Tony Hrinda was a junior project manager of SEC who reported directly to Rust. He stated that Rust, on approximately fifteen (15) occasions, had SEC employees perform services for jobs that were not on SEC's books. Rust would have the time for the employees of SEC billed to a project on the books of SEC. Rust, not SEC, would receive payment for these jobs. Hrinda said in 2001 Rust "had at least five (5) SEC workers at his personal residence working on renovations and additions." Hridra understood that these employees were billed to SEC projects. After Rust's accident, Hrinda told Taylor about Rust having side jobs and personal work billed to SEC jobs.

**Rust Deposition.** Rust had been given access to forty (40) boxes of business records of SEC, and SEC had delivered approximately one thousand two hundred (1,200) pages of accounting records to Rust's attorney prior to the deposition on September 9, 2004, and continued on October 27, 2004. Prior to his second deposition, Rust produced certain commission sheets that he said supported his claim for commissions. The following exchanges are taken from the portion of Rust's deposition supporting SEC's Motion for Summary Judgment.

Q. Did those files contain commission breakdown sheets?
A. Maybe some did, yes.
Q. How many of the files that you saw didn't have commission breakdown sheets?
A. I didn't count them.
Q. How many had commission breakdown sheets?
A. I don't know that.
Q. How many of the 40 boxes did you even open?
A. I think I probably glanced over the majority of the 40 boxes.
Q. How long were you in the room with the boxes?
A. I don't recall.
Q. Was it a day and a half, two days?
A. No. It was all in one day.
Q. Did you get there early in the morning and leave late at night?
A. I didn't leave late at night. I don't know how early I got there.
Q. What year was it?
A. I couldn't tell you that. I would assume around 2002. Maybe 2003. I don't really know.
Q. How many times did you look at the boxes? Did you see them in one time, two times, five times?
A. One day. (October 27, 2004 deposition, p.39 l. 3 - p.40 l.7)

Q. And you contend that you have not received the accounting records?
A. I have not seen the accounting records.
Q. Now, you didn't receive documents a year ago, some 1,200 pages of accounting records?
(Objection omitted)
THE WITNESS: Yes. (September 9, 2004 deposition, p.25, ll.1-9)

Q. Do you recall getting some 1,200 or so pages of accounting printouts of accounting records from SEC delivered to your counsel or anyone in this case?
(Objection omitted)
THE WITNESS: I can't say I recall that.(September 9, 2004 deposition, p.25, ll.16-22)

Q. Do you recall since you filed this complaint ever looking at this stack of commission sheets that your counsel provided me from whatever source that it originally came?
A. I looked at them yesterday.

Q. Before yesterday and between April of 2002, have you ever compared the allegations you made under oath in this complaint with the commission sheets that your counsel provided me?
A. No. (October 27, 2004 deposition, p.76,ll.6-17)

Q. Okay. Good. Is there anything besides your gut feeling that you're owed $200,000 to $300,000 for unpaid commissions that you can provide to the Court that would explain the basis for your unpaid commission claim?
A. That I can provide?
Q. Yes.
A. No. (October 27, 2004 deposition, p.47, ll.5-12)

**Richard Fridge Deposition.** Richard Fridge, a certified public accountant hired by Rust, reviewed 182 commission breakdown sheets, representing 44.2% of the total revenue of SEC from January 1,1998 through July 31,2001, and extrapolated an average job amount of $11,648.44 and estimated gross revenue of $4,796,101.00 for the period covered. Fridge understood the records were job by job commission sheets, that he had every available commission sheet, and that the commission sheets were representative of SEC jobs. Fridge stated that he could not tell who the project manager was for a particular project from the information he was provided, and that if Rust was the project manager, he would receive a commission of 40% to 45%, and if someone else was the project manager, Rust would not receive a commission. Fridge counted project losses against commissions or as negative commissions. Fridge estimated Rust's total commissions for the period covered to be $458,418.00 and actual commissions paid to be $208,802.00.

**Taylor Affidavit.** Taylor examined the books and records of SEC from 1997 through 2002. He stated that certain project files were missing, but that he had been able to reconstruct those files from electronic information stored on the corporation's computer. Taylor said he spent in excess of 100 hours reviewing in excess of 500 projects. He calculated that for the covered period Rust earned gross commissions of $389,777.00, less negative commissions on projects that lost money of $133,700.00, for a total commissions due of $256,007.00. He calculated Rust was paid $264,252.00 in commissions, and concluded Rust was overcompensated $8,175.00.

Taylor reviewed each of the fifteen (15) projects on which Rust claimed in his Amended Complaint he was due commissions and addressed each project in his affidavit. Taylor stated that Rust had been paid for each of the projects according to the records of the corporation.

Taylor also reviewed Fridge's report and the 182 commission breakdown sheets Fridge relied on to formulate his opinions. Taylor criticized the methodology used by Fridge and the information Fridge used to support his opinions. Taylor claims Fridge's conclusions are fundamentally flawed because the commission breakdown sheets are not what Fridge thought they were. Taylor stated that the commission breakdown sheets were provided with each commission check to evidence the amount of each project commission comprising the check. In other words, Taylor said the commission breakdown sheets were not job by job commission sheets, but were commission sheets showing partial commissions for several jobs. Taylor also claimed that the 182 commission

breakdown sheets did not represent a statistical analysis of projects because the sheets were not a proportionate representation of projects with profits and projects with losses.

Taylor also addressed a line item in the SEC financial statement which Rust alleged supported his claim for commissions. Taylor stated that the $109,650.00 line item in the financial statement was a "plug item" like retained earnings that had accumulated over time and did not represent actual commissions owed to any employee or shareholder.

SEC provided evidence to support its Motion for Summary Judgment to show that Rust was not entitled to additional commissions. Consequently, SEC's Motion for Summary Judgment was properly supported, thereby shifting the burden to Rust to show by affidavit or other supporting documents there is a genuine issue for trial. Rust was unable to come forward with proof that he is entitled to additional commissions.

In his Amended Complaint Rust claimed he was owed $256,500.00 in commissions covering fifteen (15) projects. In his deposition he said he had a gut feeling he was owed between $200,000.00 and $300,00.00. Rust also stated that a line item listed as commissions owed of $109,650.00 in the July 31, 2001 financial statement supported his claim for commissions and that he should receive 90% to 100% of the amount because he was responsible for most of the projects. Rust produced no competent affidavits or documents to support this contention. His review of the business records made available by SEC was cursory at best. His expert's opinion as to commissions owed was based on limited information derived from the commission breakdown sheets that he understood were a representative sample of all projects on a job by job basis. That was not the case, and Fridge's opinion was based on faulty assumptions and insufficient information. Rust has not come forward with competent proof to create a genuine issue for trial that he was owed commissions. As a result, the trial court's grant of summary judgment to SEC is affirmed.

### B) Taylor's Motion for Summary Judgment -- Fraud and Breach of Fiduciary Duty

Second, Rust claims the trial court erred in granting Taylor summary judgment on the allegations of fraud and breach of fiduciary duty. In his Amended Complaint, Rust claimed that Taylor, as President and controlling shareholder, acted fraudulently and breached his fiduciary duty to act in the best interest of the corporation and the shareholders "by unilaterally adopting" a plan to liquidate the assets of the corporation at a time when the corporation "was profitable and had material value as a going concern." Rust did not claim the directors who called the special meeting failed to comply with Tenn. Code Ann. § 48-57-102, or that the notice of the special meeting sent by the corporation did not comply with Tenn. Code Ann. § 48-64-101(b) or § 48-57-102, or that the dissolution of the corporation was not carried out in compliance with Tenn. Code Ann. § 48-64-101, *et seq*.

**Taylor's Affidavit.** After taking over the day-to-day management, Taylor decided SEC should be dissolved. A Plan of Dissolution was adopted by a majority of the shareholders and the corporation proceeded to wrap up its affairs and liquidate its assets. Taylor claimed the "barriers

to, and cost of entry into this line of work are very low", that the contracts were of short duration and difficult to assign, and that the demand for underground tank removal and asbestos removal had declined. For these reasons, Taylor claimed there was no market for the business as a going concern, and that his efforts to merge SEC with another corporation failed. He valued SEC "at zero or negative." Attached to his affidavit as Exhibit F is an annual income statement for SEC showing a net income (loss) on the books of ($20,393.00) for 1997, ($32,710.00) for 1998, $10,738.00 for 1999, ($129,521.00) for 2000, ($202,683.00) for 2001, and $82,381.00 for 2002. Pursuant to Exhibit F, SEC had taxable income (loss) of ($25,748.00) for 1997, ($17,312.00) for 1998, $12,038.00 for 1999, $49,404.00 for 2000, ($204,982.00) for 2001, and $0 for 2002. Taylor stated that he handled the bidding for projects in 2002. Taylor said to keep SEC in business required his personal guarantee on the operating line of credit. In addition, the relationship between Taylor and Rust was strained and adversarial.

After collecting the accounts receivable and liquidating the physical assets at public auction, the corporation paid the proceeds towards its indebtedness pursuant to the Plan of Dissolution. Taylor personally paid $36,500.00 to SunTrust Bank because the corporation did not have the financial ability to do so. Taylor claimed he was never paid $50,000.00 to $60,000.00 for commissions that he had allowed to accrue so as to keep SEC financially viable.

**Rust Deposition.** Rust claimed that Taylor breached the fiduciary duty owed to him and the corporation by dissolving the corporation and by purchasing assets of SEC. The auction at which the LLC purchased a substantial portion of the assets was public and was conducted by James Stevens Realty & Auction Associates. The following exchange is from Rust's deposition:

Q. How did you learn of this sale of these negative air machines?
A. I went to the auction.
Q. I thought you said they were sold in a warehouse.
A. They were.
Q. The auction was at the warehouse?
A. Yes.
Q. So you're saying that 12 machines that were worth approximately $300 per machine were sold for $75.
A. Uh-huh.
Q. At the auction. Did you bid $80 to buy the 12 machines at the auction?
A. I didn't have the money.
Q. You didn't have $80 to buy 12 machines?
A. That was a piece.
Q. Oh. Okay. I'm sorry. So you're saying LLC or Mr. Taylor, according to your testimony, bought approximately 12 negative air machines for $75 a piece at the auction, when, in your mind, they were, used, probably worth $300?
A. Uh-huh.
Q. And you did not bid for those same bargains because you didn't have sufficient funds at the time?

A. Sure.

Q. Was anyone else at the auction besides yourself?

A. I think so. I know so, yes.

Q. How many other people were at the auction?

A. Oh. I don't know.

Q. Were there more than five?

A. Yes.

Q. More than ten?

A. Yes.

Q. Twenty?

A. Maybe.

Q. Did anybody else bid on anything else at the auction besides Mr. Taylor or people for LLC?

A. A few people, yes.

Q. Did you bid on anything at the auction?

A. Yes.

Q. What did you bid on at the auction?

A. I think a backhoe trailer, couple of miscellaneous hand tools.

Q. Did you purchase anything at the auction?

A. Those, backhoe trailer, miscellaneous hand tools.

Q. Did you get those items substantially below the fair market value?

A. No, not really.

Q. You feel like you paid about fair market value for them?

A. Probably. (September 9, 2004 deposition pp. 83, l.8- pp.85, l.18)


Q. If you have to sit before the judge here and tell her what the total equity value of the company was that you're asking for compensation from as of July 31, 2001, what would be the number that you could tell her as the total equity of the company?

A. I don't know.

Q. And so you don't know what 39 percent of I don't know is either, do you?

A. I know this - -

Q. No. I want to ask you. You can't give her a number that you should be awarded for your ownership of 39 percent of the company as of September 31, 2001?

A. I could give - -

Q. I'm asking you a question. Can you give her an answer?

A. Yes.

Q. And what number would that answer be?

A. The minimum number would be 39 percent of $245,308.
October 27, 2004 deposition, p.59, ll. 4-24)

**Fridge's Deposition.** Fridge used the July 31, 2001, balance sheet and determined total equity of SEC to be $245,308.00. Multiplying that figure by Rust's 39% stock ownership equals $95,670.00. Fridge admitted he did not have sufficient information to calculate a fair market value of SEC.

Taylor presented evidence to support his Motion for Summary Judgment showing that he did not commit fraud or breach any fiduciary duty. Consequently, Taylor's Motion for Summary Judgment was properly supported, thereby shifting the burden to Rust to show by affidavit or other supporting documents there is a genuine issue for trial. The documents filed by both sides showed that several key facts are not disputed. There is no dispute that the relationship between Taylor and Rust, the two shareholders owning a total of 90% of the common stock, had become untenable, if not hostile, thereby providing a valid reason for dissolution. There is no dispute that Taylor and SEC complied with the Tenn. Code Ann. 48-24-101, *et seq.*, governing voluntary dissolution. There is no dispute that the physical assets were sold at public auction attended by numerous potential buyers. There is no dispute that Rust knew about, attended, and purchased items at the auction. Rust has not come forth with competent evidence that value of the corporation exceeded the amount of its indebtedness after the accounts were collected and the assets were sold. Rust has not produced any competent evidence that there was a market for the business as a going concern. Because Rust has not shown by affidavit or otherwise that Taylor breached his fiduciary duty to Rust or the corporation, or that Taylor acted fraudulently in the dissolution of SEC, summary judgment should be granted as to Taylor. *Baker v. Promark Products West, Inc.*, 692 S.W. 2d 844 (Tenn. 1985).

We affirm the trial court's grant of summary judgment to both defendants, with the cost of the appeal assessed to David Michael Rust.

_____
ROBERT L. HOLLOWAY, JR., SP.J.